## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ISHMAEL KENDREX, | |
| *Plaintiff,* | |
| vs. | Case No. 15-1008-EFM |
| CITY OF INDEPENDENCE, KS, former Independence Police Officer CLARENCE SNYDER, | |
| *Defendants.* | |

## MEMORANDUM AND ORDER

Plaintiff Ishmael Kendrex, a passenger in a vehicle driven by Keenan McCoy (Kendrex's stepfather), was pulled over by Defendant Clarence Snyder of the City of Independence Police Department on March 23, 2011.  Snyder, along with several other officers, requested that Kendrex and McCoy exit the car while pointing loaded firearms at them.  After the approximate four-minute detention, McCoy and Kendrex were allowed to leave.

Kendrex filed suit against Snyder and the City of Independence Police Department and asserts two 42 U.S.C. § 1983 claims against Snyder.  In his first claim, he contends that Snyder engaged in racial profiling in violation of his Fourteenth Amendment constitutional right to equal protection.  In his second claim, he asserts that Snyder violated his Fourth Amendment right to be free of unreasonable seizure and excessive force.  Defendants now seek summary judgment

on Kendrex's claims and seek to exclude Kendrex's expert witness's testimony (Doc. 28).   The Court finds that Defendants' conduct did not violate the Fourteenth or Fourth Amendment. Furthermore, Plaintiff's expert testimony report is not relevant to the specific facts in this case. Thus, the Court grants Defendants' motion.

## I.        Factual and Procedural Background[1]

On March 23, 2011, at approximately 8:15 p.m., Independence Police Officers Lance Snyder, Christina Johnson, Andy Reid, and Lieutenant Lisa Helkenberg responded to a disturbance call at a local convenience store called Jiffy Mart.  When Officer Johnson arrived at Jiffy Mart, two black males were in the parking lot.    One of those males identified himself as Anthony Sterling.   He was dressed in a white shirt and his hair was in dreadlocks. Sterling reported that he had been "jumped" by two men and that the initials of one of the men who had assaulted him were J.B.  Officer Reid asked Sterling if he wanted to press charges because of the incident.  Sterling replied that he did not and that he would "take care of it on the streets."

Officer Snyder was at Jiffy Mart for approximately ten minutes and personally observed Sterling.  Sterling was thirty-one years of age, 5 feet 8 inches, and weighed approximately 155 pounds.   Officer Snyder observed that Sterling was a short, stocky black-skinned male, with dreadlocks that that did not extend past his shoulders. Officer Snyder did not talk with Sterling. None of the officers saw a gun on Sterling.

Approximately thirty minutes later after the Jiffy Mart call, there was a disturbance at a residence on North 17th Street.  Officer Snyder was not specifically dispatched to the call, but he responded to the area as backup.  This residence was J.B.'s.  Witnesses told Officer Snyder that a

---

[1]  In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

black male by the name of Anthony "Pig" Sterling had been at the residence threatening to shoot people.  Officer Snyder recognized Sterling's name from the Jiffy Mart disturbance.

One of the witnesses reported a bulge in Sterling's shirt.  Officer Snyder never saw Sterling with a weapon and never heard anyone say that they saw Sterling with a weapon. One of the witnesses at the residence told officers that Sterling was riding in a blue Caprice automobile and another witness told officers that Sterling's car was a 1993 red Mercury, older model with twenty-four inch rims.

While Officer Snyder was at the residence, a car drove by and one of the residents said "that's the car that Pig was in."  Officer Snyder drove after the car and performed a felony stop, assisted by Officer Reid.

According to Officer Snyder, a felony car stop is performed if an officer believes that there is a dangerous person in the vehicle that could cause injury to officers or the public. Snyder states that there are four components to a felony stop: (1) use of the officer's vehicle for safety, (2) drawing of weapons, (3) directing the vehicle's occupants to get out of the car one at a time, and (4) addressing each occupant of the vehicle by a cover officer one at a time until all occupants are out of the car and everyone is secured.

Officers Snyder and Reid removed four people from the vehicle, two white males and two black females, before determining that Sterling was not in the car.  Lieutenant Helkenberg responded to the scene to make a positive identification had Sterling been in the car.  After making sure that nobody in the vehicle had a warrant, officers explained to the occupants of the car why they had been stopped and that they were released to leave.

Officer Snyder returned to patrol and looked for Sterling. Sometime after 9:00 p.m., Plaintiff Ishmael Kendrex, fifteen years old at the time, was a passenger in a car driven by Keenan McCoy, his stepfather. McCoy's car was a 1988 gold Cadillac.

While McCoy and Kendrex were stopped, facing eastbound, at the traffic light at Tenth and Myrtle, McCoy noticed a police car headed south on Tenth Street, which turned right to head west on Myrtle. Officer Snyder was the driver of the police car, and he testified that when he passed McCoy's vehicle he believed that the individual in the passenger seat was Sterling. Officer Snyder made an abrupt U-turn on Myrtle, moved behind McCoy's vehicle, activated his emergency lights, and made a traffic stop.

Officer Snyder called for backup, stating that he thought he had the subject they were looking for. Before other officers arrived, McCoy turned the car off as Officer Snyder instructed him to do. Officer Reid was the next officer to arrive. Lieutenant Helkenberg and Officer Johnson were the third and fourth officers to arrive in their vehicles, and they pulled in behind McCoy's vehicle. Kendrex saw the third and fourth patrol cars turn onto Ninth Street within a minute of being stopped by Officer Snyder.

After Officer Reid arrived, Officer Snyder got out of his patrol car and stood behind the driver's door. He referred to McCoy as the "driver" and Kendrex as the "passenger," and he instructed both McCoy and Kendrex to put their hands out the window. Officer Snyder instructed McCoy to use his right hand, open the door, and get out of the car. After McCoy informed Officer Snyder that he had his seatbelt on, Snyder instructed him to take his seat belt off and follow the previous instructions. McCoy did so. Officer Snyder then instructed McCoy to walk backwards, with his hands behind his back, and toward the sound of Snyder's voice.

Officer Johnson was behind and to the left of McCoy and had her handgun pointed at him.   Officer Snyder also had his service revolver pointed at McCoy.   Officer Johnson approached McCoy and patted him down.   McCoy was upset, and Johnson told McCoy that they were looking for someone.

While Johnson approached and patted down McCoy, Snyder gave Kendrex instructions to use his left hand, unbuckle his seatbelt, get out of the vehicle, and walk slowly backwards until told to stop.   Kendrex did so until he was told to stop just past the trunk of the car.   Kendrex was also patted down.   After he was patted down, Kendrex heard a female officer say "it's not him."    At the time of the stop, Kendrex was five feet ten inches, weighed approximately 280 pounds, and had an afro hairstyle with his hair extending at least five inches from his head.

When Lieutenant Helkenberg arrived, Officers Snyder and Reid were both pointing firearms at McCoy and Kendrex.   Reid was pointing a shotgun at them.   Lieutenant Helkenberg advised Snyder that the passenger was not Sterling.   After Snyder had been advised that the passenger was not Sterling, Officer Johnson released McCoy.   Before Snyder could tell McCoy that he was free to go, McCoy became upset, yelled expletives, and repeatedly asked for Snyder's name.   Snyder never told McCoy his name and instead told McCoy that he was free to go several times.   McCoy and Kendrex then left the scene.

Officer Johnson's dashcam recorded a video of this stop, but there is a fifteen-second audio gap.   Kendrex obtained a copy of the video from the KHRC because the Independence Police Department ("IPD") no longer maintained a copy.[2]

---

[2] Plaintiff argues that the IPD destroyed evidence because they no longer had a video of the stop.  Plaintiff, however, does not specifically state what relevance this alleged destruction of evidence has on the case.

After this stop, the officers did not continue to look for Sterling or stop any other vehicles in search of Sterling.  The IPD never sought an arrest warrant for Sterling because the individual who claimed he was assaulted failed to cooperate.  No charges were ever filed against Sterling.

The IPD has a written policy prohibiting racial profiling.  The policy states:

> It is the policy of the [IPD] to treat all persons having contact with this agency in a fair, equitable, and objective manner, in accordance with law, and without consideration of their race, ethnicity, national origin, gender, religious dress or other individual characteristics.
> …
>
> "Racial profiling" means the practice of a law enforcement officer or agency relying, as the sole factor, on race, ethnicity, national origin, gender or religious dress in selecting which individual to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity. Racial profiling does not include reliance on such criteria in combination with other identifying factors when the law enforcement officer or agency is seeking to apprehend a specific suspect whose race, ethnicity, national origin, gender or religious dress is part of the description of the suspect.

On February 24, 2011, Rick Fischli, Racial Profiling Administrator of the Kansas Human Rights Commission ("KHRC"), gave a two-hour training session to the IPD on racial profiling. Snyder attended the training but does not remember it.  Snyder stated that he understood racial profiling to mean that "you cannot enforce the laws against any one race, color, religion strictly based on that race, color, or religion."  Helkenberg attended the class and found it boring, but she understands that it might not be boring for black citizens.

On April 25, 2011, McCoy filed a complaint with the KHRC alleging that he and Kendrex had been the victims of racial profiling.  On June 13, 2012, McCoy filed a Complaint in federal court against Snyder and the IPD, alleging that he was a victim of racial profiling in

violation of his constitutional rights.[3]   In 2013, Judge Robinson granted Defendants' Motion for Summary Judgment finding that there was insufficient evidence to support a racial profiling claim.[4]  On appeal to the Tenth Circuit, the case settled.

On January 7, 2015, Plaintiff Kendrex filed this suit against Snyder and the IPD.  He alleges that Defendants engaged in racial profiling and thus violated the equal protection clause of the Fourteenth Amendment.  He also claims that Defendants violated the Fourth Amendment due to an unconstitutional seizure and the use of excessive force.[5]   Defendants seek summary judgment on these claims.[6]

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[7] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[8]  The movant bears the initial burden of proof and must show the lack of evidence on an essential

---

[3] *McCoy v. City of Independence*, Case No. 12-1211-JAR.

[4] The Court notes that Plaintiff Kendrex relies heavily on the portions of Judge Robinson's discussion and analysis in her 2013 Order that could be favorable to Plaintiff.  Indeed, Plaintiff relies upon the facts set forth in Judge Robinson's order and her finding that "race was the primary basis for stopping [McCoy's] vehicle." However, the undersigned must consider the facts submitted in the briefing to him and not the facts submitted to Judge Robinson.  One difference in the facts is that the parties submitted pictures in this case and did not submit pictures in the previous case.

[5] Plaintiff also asserted a failure to train claim against the City of Independence.  In Kendrex's response to Defendants' Motion for Summary Judgment, he abandoned his claims against the City.

[6] Defendants also seek to exclude Plaintiff's designated expert witness testimony.  The Court will discuss this testimony and the relevance below.

[7] Fed. R. Civ. P. 56(a).

[8] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

element of the claim.[9]  If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[10]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[11]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[12]

## III.   Analysis

Defendants argue that Kendrex cannot establish a constitutional violation with regard to his racial profiling claim under the Fourteenth Amendment or his unreasonable seizure and excessive force claim under the Fourth Amendment and that Defendant Snyder is entitled to qualified immunity.  When a defendant raises qualified immunity on summary judgment, the burden shifts to the plaintiff to demonstrate that (1) the defendant's actions violated a constitutional or statutory right and (2) the constitutional or statutory right was clearly established at the time of the conduct at issue.[13]  The court has discretion as to which prong to decide first.[14]

---

[9] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[10] *Id*. (citing Fed. R. Civ. P. 56(e)).

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[12] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[13] *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted).

[14] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."[15]   Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[16]

### A.   Racial Profiling Claim under the Fourteenth Amendment

"[A] plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect."[17]   "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision."[18]   There are several different ways for a plaintiff to show discriminatory purpose.   Generally, most claims are based on statistical evidence showing the difference between the number of minority Americans stopped and their percentage in the relevant population.[19]   Other claims rely on direct evidence of the officer's conduct, and the court should consider the "officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances."[20]   In this case, Kendrex attempts to rely on both statistical and direct evidence to demonstrate discriminatory purpose.

---

[15] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[16] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[17] *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003).

[18] *Id.* (citations omitted).

[19] *Id.*

[20] *Id.*

With regard to the statistical evidence in this case, Kendrex presents a report from Dr. Michael Birzer, a professor of criminal justice and Director of the School of Community Affairs at Wichita State University.[21]  Dr. Birzer has performed exhaustive study, research, and writing on the subject of racial profiling.  In Dr. Birzer's report in this case, he reviewed traffic citation data from the IPD from January 1, 2008, through March 31, 2011.  He concluded that black drivers were 1.72 times more likely to be cited for a traffic violation than white drivers.

Defendants seek to exclude Kendrex's expert witness on the basis that the report does not distinguish between residents and non-residents of Independence and because the report focuses on citations, rather than stops not resulting in a citation (the type of stop that occurred in this case).  Defendants also seek to exclude the statistical evidence because it is not relevant.  The Court agrees with Defendants that the report is not relevant to the issue at hand.

Plaintiff Kendrex relies upon Dr. Birzer's report in an effort to establish discriminatory *purpose*.[22]  Statistical evidence, standing alone, is rarely sufficient to demonstrate a discriminatory purpose.[23]  "This is [so] because, to prevail on an equal protection claim, a plaintiff must prove that the decisionmakers in *his* case acted with discriminatory purpose."[24] Using statistical evidence regarding the IPD as a whole to infer that a specific officer, i.e., Officer Snyder, was motivated by a discriminatory purpose "would be a gross misuse of

---

[21] In the previous case before Judge Robinson, she noted that Plaintiff McCoy did not provide any statistical evidence to demonstrate discriminatory purpose on his racial profiling claim.  Plaintiff Kendrex apparently attempts to remedy that problem in this case by now including Dr. Birzer's report.

[22] Plaintiff primarily focuses on Dr. Birzer's report to demonstrate discriminatory *purpose* and not discriminatory *effect*. The distinction is relevant because Dr. Birzer's report does not contain specific information with regard to Snyder.

[23] *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012).

[24] *Id.* (quotation marks and citation omitted).

-10-

statistical data."[25]  Thus, Plaintiff's statistical evidence regarding the IPD's apparent conduct of citing black drivers 1.72 times more than white drivers for a traffic citation is not relevant to demonstrate that Officer Snyder was motivated by a discriminatory purpose.

As to the direct evidence, Kendrex asserts that the following facts demonstrate Defendant Snyder's discriminatory purpose: (1) no traffic violation had been committed by McCoy (the driver of the car in which Kendrex was the passenger); (2) the car did not match a description of Sterling's car or the car that he may have been riding in that evening; (3) McCoy did not match a description of Sterling; and (4) Kendrex did not resemble Sterling.  It is uncontroverted that Snyder did not stop McCoy's car based on a traffic violation, on a vehicle description, or on McCoy's resemblance of Sterling.  Snyder claims that he stopped the vehicle because he believed that Kendrex resembled Sterling.  Kendrex asserts that he does not resemble Sterling. Kendrex had a different hairstyle, was approximately 100 pounds heavier, and approximately fifteen years younger than Sterling.[26] This Court agrees that had these two individuals been standing next to each other, the disparities would have been apparent.  But the stop did not occur in broad daylight.  Instead, it occurred at night and while Snyder was traveling in a moving car, which allowed Snyder to observe Kendrex in less than ideal conditions, in a brief timeframe, and from the chest up.  Thus, the Court cannot conclude that Kendrex obviously did not resemble Sterling in these conditions.

It is undisputed that race was a factor in stopping the vehicle because officers were searching for a black individual and thus race necessarily had to play a role in stopping the

---

[25] *See United States v. Coleman*, 483 F. App'x 419, 421 (10th Cir. 2012).

[26] Indeed, Judge Robinson pointed out in her order that there were "glaring disparities in these individuals' resemblance" that "should have been readily apparent."

vehicle.  But even if race was the only identifier and the basis for stopping the car (and not the resemblance of Kendrex to Sterling), there is no other evidence that Snyder was motivated by a discriminatory purpose.[27]  As noted above, the statistical evidence Plaintiff relies upon fails to demonstrate anything regarding Snyder's purpose.  Plaintiff does not direct the Court to any evidence that Snyder has engaged in a pattern of discriminatory behavior.  Nor is there any evidence that Snyder asked any questions or made any statements during this traffic stop that would lead a reasonable person to believe that Snyder pulled over the vehicle with the intent to discriminate.  Accordingly, Plaintiff does not set forth clear evidence creating a genuine issue of material fact that Snyder was motivated by a discriminatory purpose.

Furthermore, Plaintiff cannot demonstrate a discriminatory effect.  To establish a discriminatory effect, a plaintiff can rely upon statistical evidence or by showing that a similarly situated non-protected individual was treated more favorably.[28]  As noted above, Plaintiff provides Dr. Birzer's report which indicates that black drivers are 1.72 times more likely to receive a traffic citation than a white driver.  Plaintiff, however, does not specifically argue that this report demonstrates a discriminatory *effect* but instead argues that it shows discriminatory *purpose*.[29]  The Court will not make arguments for Plaintiff as to how the statistical evidence demonstrates discriminatory effect.  The Court simply notes that the report does not relate to the stop itself, or to stops based on an alleged mistaken identity, and thus would be irrelevant to

---

[27] Indeed, Judge Robinson found in her previous order that race was the primary basis for stopping McCoy's vehicle.  She went on to find, however, that even if race was the primary basis, no other evidence supported a finding of discriminatory purpose.

[28] *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1265 (10th Cir. 2006); *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001).

[29] As noted above, the report cannot be used to demonstrate discriminatory purpose because the IPD's apparent conduct of citing black drivers 1.72 times more than white drivers for a traffic citation is not relevant to demonstrate Officer Snyder's alleged discriminatory purpose.

-12-

show discriminatory effect in this particular case.  Accordingly, Plaintiff does not come forward with relevant statistical evidence.

Plaintiff also does not come forward with evidence that a similarly situated individual was treated more favorably.  Defendants, in fact, argue that the evidence demonstrates to the contrary and that Defendant Snyder treated other individuals (black and white) the same as Kendrex.  In this case, Snyder performed another felony stop on a vehicle that contained two white males and two black females.  After determining that Sterling was not in the car, Snyder allowed the individuals to leave.  Although the first vehicle stop occurred under different circumstances, i.e., due to a possible vehicle match rather than a possible suspect match, it demonstrates that other individuals were treated in a similar manner with regard to the use of a felony stop.[30]  Accordingly, Plaintiff does not direct the Court to any clear evidence demonstrating discriminatory effect.  Thus, Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

### B.  Unreasonable Seizure and Excessive Force Claim under the Fourth Amendment

Plaintiff also brings a claim under the Fourth Amendment alleging that he was subject to an unreasonable seizure and excessive force.[31] Defendants argue that the stop and the use of force were reasonable under the Fourth Amendment.  They also argue that Snyder is entitled to qualified immunity.

---

[30] Plaintiff makes the brief argument that discriminatory effect is obvious because Defendant Snyder only stopped one car (the one that Kendrex was in) that night.  As noted above, Snyder actually stopped two cars that night.  And as Judge Robinson pointed out in her order, the fact that Snyder did not stop any other cars on the basis of race "cuts against Plaintiff's claim of discriminatory effect because it acknowledges that the stop was an isolated example of Snyder's misidentification."

[31] The Court notes that in Judge Robinson's previous order she stated that Plaintiff McCoy's more appropriate claim would be one brought under the Fourth Amendment rather than a Fourteenth Amendment equal protection claim.  Judge Robinson, however, did not decide whether a Fourth Amendment violation occurred because such a claim was not brought in McCoy's case.

The Fourth Amendment protects against unreasonable seizures.  "A seizure occurs when a reasonable person would not feel free to leave or disregard the contact."[32]  Defendants concede that Plaintiff was seized.  They argue, however, that it was not unreasonable because the stop was based upon reasonable suspicion.

"Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity."[33]   An investigative detention, or a *Terry* stop, does not require probable cause.[34]  "[A] *Terry* stop is justified if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot."[35]  "[A]n arrest is a form of Fourth Amendment seizure characterized by the intrusive or lengthy nature of the detention.  An arrest must be supported by probable cause."[36]  "[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest,"[37] but these techniques "generally exceed the scope of an investigative detention and enter the realm of an arrest."[38] To determine whether these more intrusive measures were necessary, the focus is "on whether the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate."[39]

---

[32] *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (internal quotation marks and citation omitted).

[33] *Id.*

[34] *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012).

[35] *Id.* (internal quotation marks and citation omitted).

[36] *Id.* at 1192.

[37] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).

[38] *Cortez v. McCauley*, 478 F.3d 1108, 1115-16 (10th Cir. 2007) (citing *Melendez-Garcia*, 28 F.3d at 1052).

[39] *United States v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

When evaluating a *Terry* stop, there are two inquiries. The Court first considers "whether the stop was justified at its inception."[40] Next, the Court considers "whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place."[41]  If the stop was not limited in scope, the seizure is only justified by probable cause or consent.[42]

Plaintiff argues that the stop was not justified at its inception, and was not reasonable, because he did not resemble the suspect the officers were searching for.  Both parties discuss a Tenth Circuit case, *United States v. Lang*,[43] in which officers stopped a vehicle containing an individual whom they mistakenly believed was the suspect they were searching for.  In *Lang*, the plaintiff argued that a mistake in identity was unreasonable because of the physical dissimilarities in appearance between the suspect and the plaintiff.[44]  The plaintiff and the suspect differed in height, weight, hairstyle, and facial hair.[45]  The Tenth Circuit noted that the physical descriptions were "patently different."[46]  The Tenth Circuit found, however, that the district court was correct in finding that the officer possessed sufficient justification to stop the car because the officer only had a short time to observe the plaintiff in a moving vehicle.[47]  "The brief time period and the difficulty of identifying someone in a moving vehicle must be taken

---

[40] *United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996).

[41] *Id.* (citations omitted).

[42] *United States v. Shareef*, 100 F.3d 1491, 1501 (10th Cir. 1996).

[43] 81 F.3d 955 (10th Cir. 1996).

[44] *Id.* at 966.

[45] *Id.*

[46] *Id.*

[47] *Id.*

into consideration in evaluating the reasonableness of [the officer's] mistake."[48]   In addition, the Tenth Circuit noted that the district court had found that the mug shot picture of the suspect looked similar to the plaintiff in the vehicle.[49]

Here, there are similar facts.   Although the written, physical descriptions of Plaintiff Kendrex and Sterling are markedly different, Snyder only had a brief time to observe Kendrex. Similar to the officer in *Lang*, Snyder observed Kendrex from a moving car, from a distance and only in a short timeframe.   An additional consideration in this case is that the stop occurred at night making it even more difficult to make a positive identification.[50]   In making the faulty identification, Snyder only observed Kendrex from the chest up.[51]   In considering the totality of the circumstances, Snyder's mistaken identification of Kendrex as Sterling was not unreasonable. Thus, there was sufficient justification for making the stop.

The next question is whether the stop was limited in scope to the circumstances justifying the stop in the first place.[52]   This standard requires an objectively reasonable basis for the duration and extent of the seizure based upon the circumstances.[53]   The stop did not exceed four minutes.   And once the officers determined that Kendrex was not Sterling, they told McCoy and Kendrex that they were free to leave.   Thus, the duration was objectively reasonable and the only

---

[48] *Id.*

[49] *Id.*

[50] In *Lang*, the stop occurred in daylight. *Id.* at 959.

[51] The parties submitted photos of both Sterling and Kendrex. Viewing these two photos side by side, there appears to be a facial resemblance.   The Court notes, however, that Kendrex's photograph is not one of him with his afro. The Court also notes that in the less than ideal conditions here in which Snyder observed Kendrex, shoulder length dreadlocks and an afro hairstyle could appear similarly.

[52] *Lang*, 81 F.3d at 966.

[53] *Id.*

question that remains is whether the extent of the seizure was reasonable based on the circumstances.

In effectuating the stop, Defendant Snyder and the other officers pointed firearms at McCoy and Kendrex.  Plaintiff asserts that this use of force was not reasonable based on the facts known to the officers.  Specifically, Plaintiff contends that the officers let Sterling walk away from the disturbance at Jiffy Mart even though Sterling had said he was going to take care of the matter on the streets.  Plaintiff also argues that nobody saw Sterling with a gun.  Thus, it appears that Plaintiff argues that Sterling did not pose a threat requiring the use of firearms and Snyder's use of firearms was unreasonable in pulling over Plaintiff.

Defendants, however, contend that the felony stop was reasonable and necessary due to the events that occurred after the Jiffy Mart disturbance.  In the one-hour timeframe after the disturbance, Sterling went to a residence threatening to shoot people.  These individuals called the police.  One witness at the residence reported that Sterling had a bulge in his shirt.

Case law demonstrates that

> [t]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  The degree of physical coercion that law enforcement officers may use is not unlimited, however, and *all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.[54]

"The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection."[55] "Since police officers should not be required to

---

[54] *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (internal quotation marks and citations omitted).

[55] *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (citation omitted).

take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their personal safety and maintain the status quo during the course of a *Terry* stop."[56]  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[57]

When Snyder pulled Plaintiff over, he thought (mistakenly) that Plaintiff was Sterling and was in the vehicle.  Snyder believed that Sterling was potentially armed and dangerous in that Sterling had just threatened to shoot people.  Under the totality of the circumstances, the felony stop (use of firearms when asking the occupants of the vehicle to get out, pat them down, and obtain their identity) was reasonable.  As soon as the officers determined that Kendrex was not Sterling (within four minutes of the initial stop), the officers lowered their weapons and thus there was no continued use of force.[58]  The officers then told McCoy and Plaintiff Kendrex that they were free to leave.  Here, the detention and use of force was limited in scope and reasonably necessary to protect the officers' personal safety.  Furthermore, the Court finds that the facts known to Snyder would warrant him (a man of reasonable caution) to use more intrusive measures in making the traffic stop.  Thus, the detention and use of force was reasonable under the Fourth Amendment.[59]

---

[56] *Lang*, 81 F.3d at 966 (quotation marks and citation omitted).

[57] *Cortez*, 478 F.3d at 1125 (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

[58] *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1197 (10th Cir. 2001) (finding an excessive use of force when officers continued to hold children at gunpoint after the children had submitted to the officers' initial show of force).

[59] Defendants argue that Snyder did not use any force against Kendrex, let alone excessive force, because Snyder never touched Kendrex and Kendrex did not sustain a physical injury.  This argument, however, is not relevant because an excessive force claim does not require physical contact or physical injury. *See Holland*, 268 F.3d at 1195 (stating that the fact that the plaintiffs did not suffer physical injury during the raid did not foreclose a

In sum, the Court finds that the *Terry* stop was justified at its inception and in its scope. In addition, the Court concludes that Snyder did not use excessive force. Thus, there was no constitutional violation. Accordingly, Defendants are entitled to summary judgment on Plaintiff Kendrex's unreasonable seizure and excessive use of force claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Motion to Exclude Expert Witness (Doc. 28) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Hearing (Doc. 36) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 20th day of July, 2016.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

finding of the use of excessive force because "the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm.").